IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


**CITY OF PORTLAND,**

                Plaintiff.

     v.

**HOMEAWAY.COM, INC. and
HOMEAWAY, INC.,**

          Defendants.

No. 3:15-cv-01984-MO

OPINION AND ORDER


**MOSMAN, J.**,

    Plaintiff City of Portland ("the City") sued Defendants HomeAway.com, Inc. and

HomeAway, Inc. (collectively "HomeAway") for failure to comply with various provisions of

the Portland City Code collectively known as the "Transient Lodgings Tax." After I dismissed its

original Complaint [1], the City filed an Amended Complaint [34], which HomeAway now

moves to dismiss. For the reasons set forth below, HomeAway's Motion to Dismiss for Failure

to State a Claim [37] is GRANTED in part and DENIED in part.

## BACKGROUND

    HomeAway operates an online vacation rental marketplace where people interested in

making their homes available for short-term rental may advertise their property. Travelers

interested in renting a property can access HomeAway's websites to search for and find available

properties. HomeAway puts the traveler in contact with the owner or lessee of the property to

sort out the details of the lodging arrangement. HomeAway has property listings located all over the world, including in Portland.

In 1972, the City enacted a Transient Lodgings Tax Ordinance, Portland City Code ("PCC") § 6.04.010, *et seq.* ("the Ordinance"), providing in part that "[e]very [hotel] operator renting rooms or space for lodging or sleeping purposes in this City . . . shall collect a tax from the transient" to be remitted to the City. PCC § 6.04.030(A) (2015). The Ordinance applies to hotel "Operators," defined by the Ordinance as "the person who is proprietor of the hotel in any capacity. Where the operator performs his/her functions through a managing agent of any type or character other than an employee, the managing agent shall also be deemed an operator . . . ." PCC § 6.04.010(M). The Ordinance authorizes the City to levy fines against Operators that do not comply with the Ordinance. *See, e.g.*, PCC § 6.04.170.

On January 21, 2015, the Portland City Council passed amendments to the Ordinance that took effect on February 20, 2015.[1] The apparent goal of the City Council in passing the amendments was to extend the Ordinance to cover "Booking Agents." The Ordinance defines "Booking Agent" as "an Operator or any person that provides a means through which a Host may offer a Short-Term Rental for transient lodging occupancy. This service is usually, though not necessarily, provided through an online platform and generally allows a Host to advertise the Short-Term Rental through a website . . . ." PCC § 6.04.010(D). The Ordinance expressly lists "[o]nline travel booking sites" as examples of "Booking Agents." *Id.*

After the City Council passed the 2015 amendments to the Ordinance, the City sent HomeAway notices in which the City contended that HomeAway was in violation of various provisions of the Ordinance. Included in these notices was an assessment of $2,540,106 in

---

[1] The Ordinance was amended again in January 2017. Thus, citations in this Opinion and Order to PCC § 6.04 do not necessarily reflect the current language of the Ordinance.

presumptive taxes, penalties, and interest. HomeAway refused to pay the assessment, claiming it was not in violation of the Ordinance because it was not an Operator or Booking Agent and therefore did not fall under the Ordinance's terms. On October 21, 2015, the City filed this lawsuit against HomeAway seeking a declaratory judgment that HomeAway is an Operator or a Booking Agent, a reduction of fines to judgment, a reduction of presumptive taxes to judgment, and an injunction enjoining HomeAway's operations in Portland.

## PROCEDURAL HISTORY

On May 17, 2016, I held oral argument on HomeAway's first Motion to Dismiss [7]. From the bench [28], I GRANTED HomeAway's motion and DENIED the City's request for injunctive relief. I later provided an Opinion and Order [29] clarifying my rulings. In my Opinion and Order, I held that: (1) the City had not sufficiently alleged that HomeAway is an Operator under the Ordinance; (2) the Portland City Charter ("the Charter") does not grant the City authority to impose tax collection obligations on Booking Agents; (3) the City had not sufficiently alleged that HomeAway falls under the City's authority to impose tax collection obligations on Booking Agents under the relevant Oregon state statutes; and (4) the Ordinance does not impose any regulatory duties or responsibilities on HomeAway as a Booking Agent. I dismissed the Complaint but granted leave to amend.

On July 11, 2016, the City filed its Amended Complaint [34]. HomeAway moves to dismiss the Amended Complaint for failure to state a claim. I held oral argument on the current motion on December 16, 2016.

## LEGAL STANDARD

When reviewing a motion to dismiss, the court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). A court need not accept legal conclusions as

true because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading that offers only "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). While a plaintiff does not need to make detailed factual allegations at the pleading stage, the allegations must be sufficiently specific to give the defendant "fair notice" of the claim and the grounds on which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (citing *Twombly*, 550 U.S. at 555).

Federal Rule of Civil Procedure 15 provides that a court should freely give leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(2). As such, when a court dismisses a complaint for failure to state a claim, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serrv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). If amendment would be futile, the court need not grant leave to amend. *Id.*

## DISCUSSION

HomeAway argues that the Amended Complaint should be dismissed for three principal reasons: (1) the City has failed to allege sufficient facts to show that HomeAway is a Managing Agent, and therefore an Operator, under the Ordinance; (2) the City has failed to allege sufficient facts to show that HomeAway is a Booking Agent under the Ordinance or a Transient Lodging Intermediary under relevant Oregon state statutes; and (3) even if HomeAway is deemed an Operator under the Ordinance, federal law preempts the City's claim seeking to compel

HomeAway to provide customer information and display permit numbers when advertising. I will address each argument in turn.

## I.      HomeAway as a Managing Agent

The City's First, Fourth, Sixth, Ninth, and a portion of its Eleventh Claims are all premised on the notion that HomeAway qualifies as an Operator under the Ordinance. The Ordinance defines an Operator as a "person who is [a] proprietor of the hotel in any capacity. Where the operator performs his/her functions through a managing agent of any type or character other than an employee, the managing agent shall also be deemed an operator . . . ." PCC § 6.04.010(M). The City does not allege that HomeAway is a proprietor of hotel properties. Thus, HomeAway can be an Operator only if it qualifies as a Managing Agent.

A Managing Agent is defined as a "person with general power involving the exercise of judgment and discretion, as opposed to an ordinary agent who acts under the direction and control of the principal." *Managing Agent*, *Black's Law Dictionary* (10th ed. 2014). As such, to be a Managing Agent under the Ordinance, a person must exercise judgment and discretion in performing the functions of a hotel proprietor. *See id.*; PCC § 6.04.010(M).

### A.  *Judgment and Discretion in Performing the Functions of an Operator*

The parties dispute whether a Managing Agent must perform all the functions of a proprietor or merely a subset of those functions. HomeAway argues that the Ordinance's reference to "his/her" functions, without any additional limiting terms, means that a Managing Agent must perform all of an Operator's functions in order to be considered an Operator. The City suggests that the performance of an Operator's significant functions is sufficient, as long as the entity exercises judgment and discretion in performing those functions.

I agree with HomeAway. The Ordinance provides no limiting term to "his/her functions,"

and the City provides no persuasive reason to read one into the text. *See* Or. Rev. Stat. § 174.010 (2016); *Ramirez v. Haw. T & S Enters., Inc.*, 39 P.3d 931, 936 (Or. App. 2002). The fact that a Managing Agent can be of any type or character does not limit the functions that a Managing Agent must perform in order to be deemed an Operator. Moreover, a contrary interpretation of the Ordinance's language would lead to a rather strange result. If the Ordinance could be read to require the performance of only some functions, a third party exercising judgment and discretion in performing cleaning services, for example, would qualify as a Managing Agent and, therefore, an Operator. I find such interpretation to be untenable. As such, in order to be a Managing Agent under the Ordinance, an entity must perform all or nearly all the functions of an Operator.

Even if the Ordinance does not require an entity to perform all an Operator's functions to be a Managing Agent, it certainly requires more than what the City alleges here. Although the City alleges several significant functions that HomeAway does perform, it fails to allege other functions that are fundamental in operating hotel properties. The City fails to allege, for example that HomeAway provides access and services for the rental properties, sets the price charged for occupancy, and accepts or rejects reservation requests. The City alleges some actions that relate to these functions, such as penalizing hosts who do not keep their availability calendars up to date, but not enough to show that HomeAway exercises judgment and discretion in performing those functions. Thus, because the City fails to allege that HomeAway exercises judgment and discretion over several significant proprietary functions, let alone all of them, HomeAway cannot qualify as a Managing Agent under the Ordinance.

### B.  *Similar Cases Around the Country*

The parties point to several cases that have addressed whether online travel companies ("OTCs") are managing agents under similar transient lodging tax ordinances in other

jurisdictions. All of these cases have one common characteristic: they all involve OTCs that purchase hotel rooms at wholesale prices and then resell them at higher retail prices. *See, e.g.*, *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 313 (4th Cir. 2009); *City of Goodlettsville v. Priceline.com, Inc.*, 605 F. Supp. 2d 982, 993-97 (M.D. Tenn. 2009). Despite this common fact, the outcomes have been mixed. In some cases, courts have allowed the complaints to move forward, reasoning, in large part, that the OTCs "control" the rooms to an extent that triggers the relevant tax ordinances. *See, e.g.*, *City of Goodlettesville*, 605 F. Supp. 2d at 993-97; *City of Charleston v. Hotels.com*, 520 F. Supp. 2d 757, 768 (D.S.C. 2007); *City of San Antonio v. Hotels.com, LP*, No. SA-06-CA-381-OG, 2007 WL 1541184, at *2-3 (W.D. Tex. 2007). In other cases, however, courts have dismissed the complaints because the OTCs do not "perform the functions" of hotel operators or participate in the "day to day operation or management of hotels." *See, e.g.*, *Columbus v. Hotels.com, L.P.*, 693 F.3d 642, 649 (6th Cir. 2012); *Pitt Cnty.*, 553 F.3d at 313; *City of Findlay v. Hotels.com*, 561 F. Supp. 2d 917, 921 (N.D. Ohio 2008).

Here, the task of reconciling these cases is somewhat relieved by the fact that HomeAway is not the same type of OTC as companies like Priceline and Hotels.com. Because the OTCs purchased and then resold hotel rooms directly to patrons, they had a degree of control over the rooms that HomeAway has not been alleged to have. The OTCs, for example, were able to confirm or reject reservations, set pricing, and receive payments directly from patrons. Although the City alleges that patrons make payments directly to HomeAway, there is no dispute that HomeAway does not exercise judgment and discretion in confirming or rejecting reservations, or setting prices for any short-term rentals. Thus, even if cases in which courts allowed the complaints to move forward were for some reason more persuasive, there is an important factual distinction in the case at hand that would warrant a different outcome.

Because the City fails to allege sufficient facts demonstrating that HomeAway is a Managing Agent, I dismiss the City's First, Fourth, Sixth, Ninth, and a portion of its Eleventh Claims for relief. Furthermore, because it is undisputed that HomeAway does not perform the functions the City fails to allege, I dismiss the claims with prejudice.

## II.    HomeAway as a Booking Agent or Transient Lodging Intermediary

The City's Second, Third, Fifth, Seventh, Eighth, Tenth, and a portion of its Eleventh Claims are all based on the notion that HomeAway is either a Booking Agent under the Ordinance, or a Transient Lodging Provider or Intermediary under the transient lodging tax statute. For the reasons stated below, the City has alleged enough facts to demonstrate that HomeAway is required to collect taxes as a Transient Lodging Intermediary. Thus, the City has stated a plausible claim for relief under the Ordinance and transient lodging tax statute.

### A.  *HomeAway as a Booking Agent Under the Ordinance*

The Ordinance defines Booking Agent as "an Operator or any person that provides a means through which a Host may offer a Short-Term Rental for transient lodging occupancy. This service is usually, though not necessarily, provided through an online platform and generally allows a Host to advertise the Short-Term Rental through a website . . . ." PCC § 6.04.010(D). The Ordinance expressly lists "[o]nline travel booking sites" as examples of Booking Agents.

In my previous Opinion and Order [29], I held that the Charter does not give the City Council authority to tax HomeAway as a Booking Agent under the Ordinance. Section 7-113(1) of the Charter authorizes the City to impose a tax on "owners or operators" of hotels and other

properties.[2] Because the ordinary definition of operator is much narrower than the Ordinance's definition of Booking Agent, I found the City Council acted *ultra vires* when it attempted to impose tax collection obligations on HomeAway under the authority granted to it by the Charter.

The City now argues that my previous holding only pertained to Section 7-113(1) of the Charter, rather than the Charter as a whole. The City is correct because in my Opinion and Order, Section 7-113(1) was the only supposed grant of Charter authority that I considered. Thus, I must consider whether the City's home rule status and other provisions in the Charter give the City Council authority to tax HomeAway as a Booking Agent.[3]

### 1. Inherent Authority to Tax Under State Home Rule Provisions

The City first argues that the home rule provisions under the Oregon Constitution give the City the authority to tax HomeAway as a Booking Agent. The "'home rule provisions' permit the people of a city or town to decide upon the organization of their government and scope of its powers under its charter, without the need to obtain statutory authorization from the legislature." *Jarvill v. City of Eugene*, 613 P.2d 1, 7-8 (Or. 1980) (en banc). In other words, a city's voters can give the city government the ability to levy taxes without legislative authorization. *Id.* But this does not mean a home rule city can tax with impunity. A city has authority to impose a tax only if (1) the Charter confers such authority, explicitly or implicitly, and (2) the authority has not been preempted by state or federal law. *See id.* at 8; *AT&T Commc'ns of the Pac. Nw., Inc. v.*

---

[2] Section 7-113(1) of the Charter states:

> The Council may impose and levy a tax . . . on gross amounts of money, credit or other things of value *paid to or received for lodging by the owner or operator* of any hotel, motel, apartment or lodging house, mobile home or trailer park or court, or any other place in the City where space designed or intended for lodging occupancy is rented by any person or persons, for any period less than monthly. . . . *The tax imposed shall be collected by the owner or operator of the rental space* in addition to the rental charge, at the time of payment of rent.

Portland City Charter ("Charter") § 7-113(1) (1994) (emphasis added).

[3] HomeAway does not appear to dispute that it qualifies as a Booking Agent under the Ordinance. Rather, HomeAway disputes that the City has authority to tax HomeAway as a Booking Agent.

*City of Eugene*, 35 P.3d 1029, 1037 (Or. App. 2001).

The City misunderstands the law surrounding Oregon's home rule provisions. Contrary to the City's arguments, home rule provisions grant city residents – not city governments – the ability to define the scope of municipal powers without legislative authorization. City residents exercise this ability by voting on and enacting city charters. If a charter fails to grant certain municipal powers, the city government will have no authority, under the home rule provisions at least, to exercise those powers. Thus, the City's argument that home rule cities have "inherent authority to tax and do not need express charter or legislative authorization to do so" is incorrect.

### 2. Other Potential Sources of Authority Within the Charter

Despite arguing that Charter authorization is unnecessary, the City asserts some Charter provisions that purportedly give it the authority to tax HomeAway as a Booking Agent. These provisions are Sections 1-102, 2-104, and 13-201.[4]

### a) Section 1-102

Section 1-102 grants the City "all governmental powers . . . subject to the limitations prescribed by the constitution and laws of the State." Charter § 1-102 (1962). Such a sweeping grant of authority would seemingly include the general ability to tax. In *City of Portland v. Portland Gas & Coke*, however, the Oregon Supreme Court held that a predecessor to Section 1-102 was not intended to allow the City to tax "without limitation or restriction." 156 P. 1070, 1071 (Or. 1916). My task is to determine whether this century-old case remains good law or whether it has been implicitly overruled.

---

[4] The City also asserts that Section 2-106 of the Charter gives it the authority to tax HomeAway as a Booking Agent. Section 2-106 provides that the City Council "may exercise any power or authority granted by Oregon statute to municipal corporations at any time and also to cities of a class which includes the City of Portland." Charter § 2-106 (1962). In other words, Section 2-106 grants the City the authority to tax HomeAway as a Booking Agent so far as there is an Oregon statute that gives it that authority. This depends on whether the City has adequately alleged that HomeAway is required to collect and remit taxes under the transient lodging tax statute, which I discuss in detail below.

The City argues that because *Portland Gas & Coke* was decided before *Jarvill*, its conclusion that a predecessor to Section 1-102 did not include an inherent authority to tax is no longer reliable. Again, the City misinterprets the extent of *Jarvill's* holding. In *Jarvill*, the voters approved an amendment to the charter that allowed the city council to impose taxes in a downtown development district. 613 P.2d at 2-3.  The Oregon Supreme Court upheld the city's powers under the charter and found for the first time that home rule authority includes the general authority to tax. *Id.* at 7-8; *see also Nw. Nat. Gas Co. v. City of Gresham*, 374 P.3d 829, 836 n.5 (Or. 2016). But the court also stated that this authority lies with a city's voters; not the city government itself. *Jarvill*, 613 P.2d at 7-8. In other words, even though a city does not need authorization from the legislature to impose a tax, it must still have authority from its charter to do so.

In *Portland Gas & Coke*, the Oregon Supreme Court held that a predecessor to Section 1-102 did not allow the city to tax without limitation or restriction. 156 P. at 1071. The court reasoned that when read in context with the rest of the charter, the provision was not intended to establish the "power of taxation at large." *Id.* The holding in *Jarvill*, on its own, does not undermine the conclusion in *Portland Gas & Coke*. *Jarvill* established that a city's voters may, by amendment to the charter, authorize the city to impose taxes without legislative approval. 613 P.2d at 7-8. If the city seeks to impose a tax, however, it must still point to a provision in the charter that gives it the authority to do so. The court in *Portland Gas & Coke* found the predecessor to Section 1-102 did not grant the city such authority, and *Jarvill*, along with the cases that followed, do not necessarily undermine that conclusion.

The City's reliance on *AT&T Communications* is also unconvincing. In *AT&T Communications*, the Oregon Court of Appeals held that Eugene's current charter – a home rule

charter enacted in 1976 – included the power to impose taxes. 35 P.3d at 1037. The charter

provision at issue in the case states: "The city has all powers that the constitution or laws of the

United States or of this state expressly or impliedly grant or allow cities, as fully as if this charter

specifically stated each of those powers." *Id.* at 1033 (quoting Eugene Charter, ch. II, § 4

(1976)). The City argues that the Eugene Charter provision, which the court concluded gave

Eugene the power to impose taxes, is similar to Section 1-102, which states: "The City of

Portland shall be invested . . . with all governmental powers except such as are expressly

conferred by law upon other public corporations within such limits and subject to the limitations

prescribed by the constitution and laws of the State." Charter § 1-102. Even though both

provisions are relatively broad, the Eugene Charter provision contains language that is missing

from Section 1-102.  Specifically, the Eugene Charter provision gives the city all powers allowed

to cities under federal or state law "as fully as if this charter specifically stated each of those

powers." *AT&T Commc'ns*, 35 P.3d at 1033. The role, if any, this specific language played in the

court's decision is unclear. Nowhere does the court cite *Portland Gas & Coke*, or attempt to

distinguish its outcome or reasoning. It is possible, however, that the court in *AT&T*

*Communications* found the language between the Eugene Charter provision and Section 1-102 to

be different enough so as to obviate the need to address the seemingly inconsistent outcome in

*Portland Gas & Coke*.

      More fundamentally, if Section 1-102 is to be read as broadly as the City suggests, other

portions of the Charter would be meaningless. Specific grants of authority, such as the authority

to construct and operate public utilities (Section 10-102), would be superfluous because "all

governmental powers" would surely already include such authority. Similarly, specific

limitations written into other sections of the Charter would be in conflict because Section 1-102

states the City's power is limited only by the "constitution and laws of the State." An interpretation that leaves such a significant portion of the Charter without meaning or in conflict is untenable. In light of this outcome, and because the conclusion in *Portland Gas & Coke* remains undisturbed, I conclude that the broad grant of authority under Section 1-102 does not give the City the authority to tax Booking Agents under the Ordinance.[5]

### b)  Section 2-104

Section 2-104 of the Charter states that the City Council "shall have and exercise all powers and authority conferred upon the City of Portland by this Charter or by general law." Charter § 2-104 (1962). As demonstrated in this and my previous Opinion and Order, the City has failed to identify any other Charter provision that gives the City authority to tax Booking Agents. Moreover, as explained above, the City does not have the inherent power to tax without limitation. Thus, Section 2-104 does not provide the City with the authority to tax HomeAway as a Booking Agent.

### c)  Section 13-201

Finally, Section 13-201 of the Charter provides that any "restriction or limitation imposed on the authority of the Council by Charter provision, applies only as its language explicitly and necessarily requires." Charter § 13-201 (1966). According to the City, this provision means that

---

[5] As I recognized above, the outcomes in *Portland Gas & Coke* and *AT&T Communications* admittedly appear to be inconsistent. What I am left with, therefore, is a choice between a century-old opinion from the Oregon Supreme Court and a much newer opinion from the Oregon Court of Appeals. With respect to interpretations of Oregon state law, views of the Oregon Supreme Court are binding on federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Reinemeyer v. SAFECO Ins. Co. of Am.*, 166 F.3d 982, 984 (9th Cir. 1999). Decisions by the Oregon Court of Appeals, however, are not binding if a federal court is "convinced by other persuasive data" that the Oregon Supreme Court would decide the issue otherwise. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940); *Teem v. Doubravsky*, No. 3:15-cv-00210-ST, 2015 WL 12661962, at *2 (D. Or. Aug. 14, 2015), *report and recommendation adopted*, 2015 WL 12669902 (D. Or. Oct. 1, 2015). Here, I am convinced by other persuasive data that the Oregon Supreme Court would not find that Section 1-102 gives the City Council the ability to tax without limitation or restriction. The Oregon Supreme Court said as much in *Portland Gas & Coke*, and a contrary interpretation would lead to an unreasonable result. Thus, I find *Portland Gas & Coke* to be a better reflection of state law on the issue.

unless a Charter provision expressly prohibits an action, the City Council has the authority to carry out the action. The City's reading of Section 13-201 is overbroad.

In Oregon, a city's charter is, "in effect, the city constitution," and "[a]ny city ordinance, rule, or regulation in conflict with its provisions is void." *Portland Police Ass'n v. Civil Serv. Bd. of Portland*, 639 P.2d 619, 623 (Or. 1982). Section 13-201, however, requires that conflicts, if possible, "be resolved so as to enable, and not restrict, the legislative authority of the city council." *Ramirez*, 39 P.3d at 936. Accordingly, when an ordinance is purportedly in conflict with the Charter, the Charter must be strictly construed so as not to limit the legislative authority otherwise granted to the City by the Charter or statute. *See* Charter § 13-201; *Ramirez*, 39 P.3d at 936.

The City relies principally on *Ramirez* when arguing that unless the City Council's actions are expressly prohibited by the Charter, they are allowed under the Charter. This interpretation takes *Ramirez* too far. In *Ramirez*, the court merely found that conflicts with the Charter should be resolved, if possible, in a way that does not restrict the legislative authority of the City Council. 39 P.3d at 936. This is not the same as saying that unless expressly prohibited by the Charter, the City Council can do whatever it wants. Even though restrictions on the City Council's authority by Charter provision are read narrowly, the City still must have authority from the "Charter, statute or general law" to carry out its legislative actions. *See* Charter § 13-201.

More fundamentally, Section 13-201 is not a grant of authority at all. Rather, it is an instruction on how to properly construe and interpret restrictions involving the Charter. The question here is whether the Charter confers upon the City the authority to tax Booking Agents. Without an initial grant of authority, from the Charter or otherwise, there is no need to reach the

potential secondary question under Section 13-201 of interpreting a limitation on such authority. Therefore, because Section 13-201 does not purport to grant the City any authority, it cannot be the source of the City's authority to tax HomeAway as a Booking Agent.

Ultimately, none of the Charter provisions discussed above give the City the authority it desires. Thus, I conclude, as I did in my previous Opinion and Order, that the Charter itself does not give the City the authority to tax HomeAway as a Booking Agent. If the City desires this authority, it can always seek to pass an amendment to the Charter by presenting the issue to the city's voters.

    **B.** ***HomeAway as a Transient Lodging Intermediary Under the Transient Lodging Tax Statute***

Regardless of its power to tax HomeAway as a Booking Agent under the Ordinance, the City claims that HomeAway is required to collect and remit taxes as a Transient Lodging Intermediary under Oregon's transient lodging tax statute. To state a claim under the statute, the City must sufficiently allege that (1) HomeAway is a "transient lodging tax collector that (2) receives the consideration rendered for occupancy of the transient lodging." Or. Rev. Stat. § 320.350(7)(b) (2013). A transient lodging tax collector is defined as "a transient lodging provider or a transient lodging intermediary." Or. Rev. Stat. § 320.300(13) (2013). The City does not allege that HomeAway qualifies as a transient lodging provider. Thus, the only way the City can demonstrate that HomeAway is subject to the transient lodging tax statute is by showing that HomeAway is a Transient Lodging Intermediary that receives consideration for occupancy of the transient lodging.

#### 1. HomeAway as a Transient Lodging Intermediary

A Transient Lodging Intermediary is a "person other than a transient lodging provider that facilitates the retail sale of transient lodging and charges for occupancy of the transient

lodging." Or. Rev. Stat. § 320.300(12). HomeAway admits the City has alleged sufficient facts to demonstrate it facilitates the retail sale of transient lodging, but not that it charges for occupancy of the transient lodging. The terms "charge" and "occupancy" are not defined by the statute. Thus, I look to the ordinary dictionary definitions to determine what the terms mean. *See Dep't of Revenue v. Faris*, 190 P.3d 364, 365 (Or. 2008).

The word "charge" means "to fix or ask as fee or payment." *Merriam-Webster's Collegiate Dictionary* 208 (11th ed. 2005). The word "occupancy" means "the fact or condition of holding, possessing, or residing in or on something." *Id.* at 858. Accordingly, in order to sufficiently plead that HomeAway is a Transient Lodging Intermediary, the Amended Complaint must allege that HomeAway fixes or asks payment for holding, possessing, or residing in the transient lodging.

There are at least two plausible ways in which the City alleges that HomeAway charges for occupancy of the transient lodging. The first is based on the service fee that HomeAway charges to patrons based on the price of the short-term rental. In the Amended Complaint, the City alleges that HomeAway calculates and receives a service charge "in consideration for occupancy of the transient lodgings." The Amended Complaint also alleges that the service fee "goes directly to HomeAway and is not optional." HomeAway admits that it charges a service fee based on the price of the rental but asserts that the fee is charged for use of its website rather than occupancy of the transient lodging. Thus, HomeAway maintains, the allegations are insufficient to demonstrate that HomeAway is a Transient Lodging Intermediary under the statute.

The second way the City demonstrates that HomeAway charges for occupancy of the transient lodging is by alleging that HomeAway is the only entity that determines the total price

that customers eventually pay. Specifically, the Amended Complaint alleges that "HomeAway calculates the total price that will be charged to its travelers for booking a room reservation." The City also asserts that HomeAway is the "merchant of record for a transaction with the traveler" and the entity that appears on the traveler's credit card statement. HomeAway disputes these allegations by pointing to its Client Services Agreement, which lists Yapstone, a third-party, as the actual processor of travelers' payments.

On their face, the City's allegations appear sufficient to plausibly allege that HomeAway is a Transient Lodging Intermediary under the statute. HomeAway's responses to the allegations, regardless of their merit, appear merely to highlight factual disputes between the parties, which generally cannot serve as the basis of dismissal under Rule 12(b)(6). HomeAway requests that I make an exception to this general rule, however, because the City's allegations are contradicted by documents on which the Amended Complaint necessarily relies.

As noted above, when ruling on a motion to dismiss, courts must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *See Knievel*, 393 F.3d at 1072. Generally, the scope of review on a Rule 12(b)(6) motion to dismiss is limited to allegations in the complaint. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). But, a court may consider extrinsic evidence on which a complaint necessarily relies if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Id.* at 998; *see also Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015) ("Although as a general rule we may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, we may consider extrinsic evidence not attached to the complaint if the document's authenticity is not contested and the plaintiff's

complaint necessarily relies on it."). If a plaintiff's allegations contradict documents referenced in the complaint, a court need not accept those allegations as true. *Johnson*, 793 F.3d at 1007.

HomeAway asserts that the Amended Complaint necessarily relies on a number of extrinsic documents that I should consider in reviewing the current Motion to Dismiss. In regard to the two allegations discussed above, HomeAway argues that I should consider the Terms and Conditions and Client Services Agreement. I am not convinced, however, that the Amended Complaint necessarily relies on these documents, and therefore, I decline to consider them.

First, HomeAway argues that the Terms and Conditions, entered into between HomeAway and travelers, clearly establish that the service fee is not for occupancy. Assuming without deciding that this contention is true, I am not convinced that the Terms and Conditions is a document upon which the Amended Complaint necessarily relies. Although the City refers to the Terms and Conditions, it does so only once. Furthermore, the reference merely states that travelers are required to agree to the Terms and Conditions before booking a room; it does not mention the service fee or whether it is charged for occupancy. As such, the Terms and Conditions is not necessarily "central" to the City's claims that HomeAway is subject to taxation based on the transient lodging tax statute. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (holding that a document was not incorporated by reference where the complaint did not "reference extensively" the document or where the document was not "integral to [the plaintiff's] claim"). Thus, the Terms and Conditions is not a document on which the Amended Complaint necessarily relies, and I decline to consider its supposedly contradictory evidence.

Even if I determined that the Amended Complaint did necessarily rely on the Terms and Conditions, I could still accept the City's allegations in the Amended Complaint as true. By my reading of *Johnson* and *Daniels-Hall*, a court is not *required* to disregard the plaintiff's

allegations when confronted with contradicting documents that are referenced by the complaint; rather, the court *may* disregard the allegations. *See Johnson*, 793 F.3d at 1008 ("[W]e *need not* accept as true allegations contradicting documents that are referenced in the complaint." (emphasis added) (citation omitted)); *Daniels-Hall*, 629 F.3d at 998 ("We are not, however, *required* to accept as true allegations that contradict exhibits attached to the Complaint . . . ." (emphasis added)). As mentioned above, the Amended Complaint references the Terms and Conditions only once, and the reference has nothing do with the City's contention that the service fee is charged for occupancy. Thus, even if I were to consider the Terms and Conditions, I would not disregard the City's allegation. I find the dispute between the parties to be primarily factual and more suited for disposition at the summary judgment stage.

HomeAway also argues that the Client Services Agreement, a contract between the property owners and Yapstone, demonstrates that Yapstone, not HomeAway, is the actual entity that processes payments from travelers. Here, it is relatively clear that the Client Services Agreement is not a document upon which the Amended Complaint necessarily relies. At oral argument, the City clearly stated it did not rely on the Client Services Agreement when drafting the Amended Complaint and even questioned the document's authenticity. As such, I do not consider the document's contents in deciding whether to accept as true the City's allegation that HomeAway calculates and processes payments from customers.

Because I remain unconvinced that the Terms and Conditions and Client Services Agreement are documents upon which the Amended Complaint necessarily relied, I do not consider them or their supposed contradictions to the City's allegations. As such, the City has made sufficient allegations to claim that HomeAway is a Transient Lodging Intermediary, and thus a transient lodging tax collector, under the transient lodging tax statute.

## 2. Consideration for Occupancy of Transient Lodging

In addition to alleging that HomeAway is a transient lodging tax collector, the City must also allege that HomeAway received consideration rendered for occupancy of the transient lodging. Or. Rev. Stat. § 320.350(7)(b). The Amended Complaint clearly alleges that "HomeAway receives consideration for occupancy of the transient lodgings that are booked and paid for through its websites, in the form of a percentage of the total rent paid by a renter." According to HomeAway, this allegation refers to the commissions that HomeAway receives from property owners on some of its listings. Because this commission is paid by the property owners to HomeAway, it is not consideration received by HomeAway from a traveler for occupancy, and therefore, HomeAway does not meet the second requirement of the statute.

Although HomeAway's reading of the City's allegation in the Amended Complaint is possible, it is not the only, or even most plausible, interpretation. Rather than referring to the commission that HomeAway receives from a property owner, Paragraph 48 more likely refers to the service fee that travelers pay to HomeAway. This reading is supported by the contents of Paragraph 47 of the Amended Complaint [34], which discuss a traveler's ability to pay online, as well as the City's Response to HomeAway's Motion to Dismiss [44]. Of course, there is a dispute about whether the service fee is charged for occupancy or merely for use of HomeAway's website. But, as discussed above, this is a factual dispute not to be determined at this stage of the litigation. Therefore, the City has sufficiently alleged that HomeAway receives consideration rendered for occupancy of the transient lodging.

The City has alleged sufficient facts to show that HomeAway is a Transient Lodging Intermediary that receives consideration for occupancy of transient lodging. Thus, the City has alleged sufficient facts to demonstrate that it may collect and remit taxes from HomeAway under

the transient lodging tax statute.[6]

## III.    Federal Preemption

Finally, HomeAway argues that even if it can be required to collect and remit transient lodging taxes under the Ordinance, federal law prohibits the City from requiring HomeAway to (1) provide the address and contact information of property owners (PCC §§ 6.04.040(C),[7] 6.04.170(E)) and (2) display short-term rental permit numbers for all transient lodging locations on its website (PCC §§ 6.04.060(D), 6.04.170(G)). In a supplemental pleading, the City admitted that the Communications Decency Act prevents the City from holding HomeAway liable for failing to display permit information on its website. Thus, the only remaining issue is whether federal law also prohibits the City from requiring HomeAway to provide the address and contact information of property owners.

I need not resolve this question because the City has failed to allege sufficient facts to demonstrate that HomeAway is a Managing Agent, and thus an Operator, under the Ordinance.

---

[6]    The parties appear to assume that if the City alleges sufficient facts to demonstrate that HomeAway is subject to the transient lodging tax statute, then the City's Second, Third, Fourth, Seventh, Eighth, Tenth, and a portion of its Eleventh Claims all survive at the motion-to-dismiss stage. It is unclear, however, whether the City is arguing that HomeAway, as a Transient Lodging Intermediary, is required to collect and remit taxes under the Ordinance by virtue of Section 2-106 of the Charter, or directly under the transient lodging tax statute independent of any city ordinance. The answer to this question, which the parties did not adequately brief, may have important implications on the case moving forward.

If the City claims the authority to impose taxes on HomeAway under the Ordinance by virtue of Section 2-106 of the Charter, the City would have to show that the obligations under the Ordinance comport with those under the transient lodging tax statute. Section 2-106 provides that the City "may exercise any power or authority granted by Oregon statute to municipal corporations." Charter § 2-106.  Thus, if the transient lodging tax statute gives the City authority to tax transient lodging tax collectors, the City may enact a city ordinance doing just that. The Ordinance at issue, however, only explicitly imposes tax collection obligations on Operators and Booking Agents, not transient lodging tax collectors. *See* PCC § 6.04.030-040. Accordingly, whether the City exercises the authority given it by the transient lodging tax statute through the Ordinance depends on whether the statute's definition of a transient lodging tax collector encompasses the Ordinance's definitions of an Operator or Booking Agent.

Alternatively, the City might simply claim that it has the authority to tax HomeAway as a Transient Lodging Intermediary under the statute, independent of any city ordinance. In this case, the City would have to show that the transient lodging tax statute actually gives the City this authority and that it can exercise this authority without implementing a city ordinance. Ultimately, the parties did not make an issue of these distinctions and, at this point in the litigation, neither will I.

[7] There appears to be some confusion as to whether the City is asserting HomeAway's obligation to provide address and contact information of property owners under PCC § 6.04.040(C) or § 6.04.060(C). In my previous Opinion and Order [29], I found that § 6.04.040(C) is the section that requires Operators to "provide all physical addresses of transient lodging occupancy locations within Portland city limits and the related contact information."

In my previous Opinion and Order [29], I concluded that Section 6.04.040(C) of the Portland City Code only applies to Operators. Since the City has failed to allege sufficient facts to show that HomeAway is an Operator, HomeAway is not subject to the obligation under Section 6.04.040(C) to provide address and contact information of property owners. This conclusion obviates the need to address whether Sections 6.04.040(C) and 6.04.170(E) are preempted by federal law.

## CONCLUSION

For the reasons stated above, I GRANT in part and DENY in part HomeAway's Motion to Dismiss for Failure to State a Claim [37]. The City has not alleged, nor can it allege, sufficient facts to demonstrate that HomeAway is a Managing Agent under the Ordinance. Thus, I DISMISS with prejudice the City's First, Fourth, Sixth, Ninth, and a portion of its Eleventh Claims for relief. The City also failed to allege sufficient facts to demonstrate that the Charter gives the City authority to tax HomeAway as a Booking Agent under the Ordinance. It alleged sufficient facts, however, to demonstrate that HomeAway is a Transient Lodging Intermediary that is required to collect and remit taxes to the City under the transient lodging tax statute. Accordingly, I DENY HomeAway's Motion to Dismiss [37] in regard to the City's Second, Third, Fifth, Seventh, Eighth, Tenth, and a portion of its Eleventh Claims for relief.

DATED this   9th   day of March, 2017.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
Chief United States District Judge